# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued October 5, 2017        Decided August 14, 2018

No. 16-5256

AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS,
APPELLANT

v.

INTERNAL REVENUE SERVICE AND JOHN A. KOSKINEN, IN HIS
OFFICIAL CAPACITY AS COMMISSIONER OF INTERNAL REVENUE
SERVICE,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:14-cv-01190)

*Douglas R. Cox* argued the cause for appellant. With him on the briefs were *Russell B. Balikian* and *Matthew S. Rozen*.

*Gilbert S. Rothenberg*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief were *Francesca Ugolini*, *Jonathan S. Cohen*, and *Bethany B. Hauser*, Attorneys.

*Noel L. Allen* was on the brief for *amicus curiae* The National Association of State Boards of Accountancy in support of neither party.

Before: ROGERS and GRIFFITH, *Circuit Judges*, and GINSBURG, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* GINSBURG.

Opinion concurring in part and dissenting in part filed by *Circuit Judge* GRIFFITH.

GINSBURG, *Senior Circuit Judge*: This case concerns a longstanding Internal Revenue Service effort to address perceived problems in the market for tax preparation services. In 2011, the IRS adopted a sweeping rule that would have regulated all tax preparers for the first time. That rule was challenged and the bulk of it was enjoined by the district court in *Loving v. IRS*, 917 F. Supp. 2d 67 (D.D.C. 2013) (*Loving I*), *vacated in part*, 920 F. Supp. 2d 108 (D.D.C. 2013) (*Loving II*), *affirmed*, 742 F.3d 1013 (D.C. Cir. 2014) (*Loving III*).

In the wake of the *Loving* litigation, the IRS instituted a voluntary scheme known as the Annual Filing Season Program. *See* REV. PROC. 2014-42, 2014-29 I.R.B. 192 (2014). The Program allows certain tax preparers, known as "unenrolled preparers" to distinguish them from those "enrolled" to practice before the IRS, to get a limited right to represent taxpayers in IRS audits of tax returns. *See id.* § 2.

The American Institute of Certified Public Accountants (AICPA) challenged the Program in district court, asserting violations of the Administrative Procedure Act (APA). The district court initially dismissed the case for lack of constitutional standing. *Am. Inst. of Cert. Pub. Accnts. v. IRS*, No. 14-1190, 2014 WL 5585334 (D.D.C. Oct. 27, 2014) (*AICPA I*). We reversed. *Am. Inst. of Cert. Pub. Accnts. v. IRS*, 804 F.3d 1193 (D.C. Cir. 2015) (*AICPA II*). On remand the

IRS moved for judgment on the pleadings, arguing that the AICPA lacked statutory standing, and the district court granted the motion. *Am. Inst. of Cert. Pub. Accnts. v. IRS*, 199 F. Supp. 3d 55 (D.D.C. 2016) (*AICPA III*). The AICPA now appeals.

We reverse, concluding the AICPA has constitutional and statutory standing to challenge the validity of the Program because its members employ unenrolled preparers. Continuing to the merits, we hold the Program does not violate the APA in any of the ways the AICPA alleges.

## I. Background

There are four categories of persons who may assist taxpayers with their returns: attorneys, certified public accountants (CPAs), IRS-credentialed preparers called "enrolled agents," and unenrolled preparers. *AICPA III*, 199 F. Supp. 3d at 57. Unenrolled preparers were not subject to any licensing requirements until 2011, when the IRS adopted a rule requiring them to become "registered tax return preparers," which entailed paying a fee, passing "a one-time competency exam," and completing a prescribed course of continuing education each year. *See* Regulations Governing Practice Before the Internal Revenue Service, 76 Fed. Reg. 32,286, 32,287 (June 3, 2011) (final rule); 31 C.F.R. §§ 10.4(c), 10.5(b)-(c), 10.6(e)(3) (2012).

The district court invalidated that rule in *Loving I* because the IRS lacked statutory authority to regulate unenrolled preparers. 917 F. Supp. 2d at 73-79. That court enjoined enforcement of the rule, *id.* at 80-81, but stayed the injunction in part to allow the IRS to continue operating "its testing and continuing-education centers" as long as the IRS did not require any tax preparer to take a test, enroll in continuing education, or pay a fee for either of those services. *Loving II*,

920 F. Supp. 2d at 112. We affirmed the judgment of the district court, *Loving III*, 742 F.3d 1013, and the IRS opted to continue with testing and continuing education as parts of a voluntary Annual Filing Season Program.

The IRS established the Program by issuing Revenue Procedure 2014-42, 2014-29 I.R.B. 192 (2014), which it did without notice and comment. Although open to all categories of tax preparers, the program is designed for unenrolled preparers.

The Program grants an annual "Record of Completion" to any participant who has obtained a preparer tax identification number, taken the annual "federal tax filing season refresher course," passed a comprehension test, completed a minimum of eighteen hours of continuing education, and "consent[ed] to be subject to the duties and restrictions relating to practice before the IRS in subpart B and section 10.51 of Circular 230 for the entire period covered by the Record of Completion." *Id.* § 4.05(1)-(4).

The IRS offers two incentives to participate in the Program. First, the IRS lists unenrolled agents with a Record of Completion in its online directory of tax preparers alongside attorneys, CPAs, and enrolled agents. Second, the IRS gives them the "limited practice right" to represent a taxpayer in the initial stages of the audit of a return he or she prepared; for this the unenrolled agent must have a Record of Completion for both the year of the return and the year the IRS initiated the audit. *Id.* § 6. Before the Program was established, all unenrolled agents had this limited practice right.

The AICPA brought a suit challenging the authority of the IRS to conduct the Program. The district court initially dismissed the case on the ground that the AICPA lacked

constitutional standing. *AICPA I*, 2014 WL 5585334. We reversed and remanded the case to the district court, holding the AICPA had constitutional standing as the representative of competitors to unenrolled agents with a Record of Completion. *AICPA II*, 804 F.3d 1193. We did not address the other standing theories advanced by the AICPA. *See id.* at 1199.

On remand the IRS argued the AICPA did not have statutory standing because it did not come within the zone of interests protected or regulated by the relevant statute. The district court agreed, holding: (i) "the competitive-harm-by-brand-dilution injury is . . . the only relevant 'grievance' for determining whether [the] AICPA satisfies the zone-of-interests test," *AICPA III*, 199 F. Supp. 3d at 64; (ii) the relevant statute for the zone of interest test is the substantive statute under which the IRS claims authority, *viz.*, 31 U.S.C. § 330(a) and portions of § 330(b), rather than the APA, *AICPA III*, 199 F. Supp. 3d at 66; (iii) the Congress enacted §§ 330(a) and (b) "to protect consumers in need of tax services," *id.* at 67; and (iv) the AICPA is not a suitable challenger for APA purposes because its interest "in avoiding intensified competition as a result of the [challenged regulation]" sets it on a "collision course with Congress's interest in safeguarding consumers." *Id.* at 69 (internal quotation marks omitted). It therefore entered judgment on the pleadings for the IRS and dismissed the case for want of statutory standing pursuant to Federal Rule of Civil Procedure 12(c). *Id.* at 73.

## II. Analysis

We review the judgment of the district court *de novo*. *Fox v. District of Columbia*, 794 F.3d 25, 29 (D.C. Cir. 2015). As explained below, we address both the AICPA's standing to bring this challenge and the underlying merits.

**A.    Standing**

Because the AICPA is an association, its standing turns upon whether at least one of its members has the requisite standing "to sue in her or his own right." *AICPA II*, 804 F.3d at 1197 (quoting *Am. Library Ass'n v. FCC*, 401 F.3d 489, 492 (D.C. Cir. 2005)).  The AICPA asserts it has standing for four independent reasons, any one of which is sufficient to satisfy the constitutional and statutory standing tests.

First, the AICPA argues its members suffer harm as competitors because the Program created a new credential, the Record of Completion, that "confuses" consumers and causes them to patronize unenrolled preparers instead of licensed CPAs.  Second, the AICPA argues its members suffer harm as employers because the Program withdrew the limited practice right unenrolled preparers had previously enjoyed and therefore limits how its members may use the unenrolled preparers in their employ.  Third, the AICPA argues its members suffer harm as employers because the Program imposed new supervisory requirements on firms that employ unenrolled preparers who hold a Record of Completion.  Fourth, the AICPA argues its members incur compliance costs to the extent they absorb the time and cost of unenrolled preparers in their employ who choose to participate in the Program.

The IRS no longer disputes that the AICPA has constitutional standing based upon its competitive injury.  It argues instead the AICPA cannot establish statutory standing on any of its proffered theories because neither it nor its members are regulated or protected by the applicable statute.  As explained below, we think it clear that a member of the

AICPA incurs a supervisory burden that confers both constitutional and statutory standing.[1]

### 1. Constitutional Standing

Constitutional standing is "an indispensable part of the plaintiff's case" that must persist through the "successive stages of the litigation." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *see Univ. Med. Ctr. of S. Nevada v. Shalala*, 173 F.3d 438, 441-42 (D.C. Cir. 1999) (assessing redressability at the time of the decision under review). In order to satisfy "the irreducible constitutional minimum of standing," a party must (1) have suffered an injury in fact, (2) that is fairly traceable to the challenged government action, and (3) will likely be redressed by a favorable decision. *Lujan*, 504 U.S. at 560.

Some members of the AICPA are injured by the Program because it imposes new supervisory responsibilities on them. As explained earlier, the Program conditions receipt of a Record of Completion upon the unenrolled preparer's "consent to be subject to the duties and restrictions relating to practice before the IRS" under subpart B of Circular 230. REV. PROC.

---

[1] It is well-settled in this circuit that "the injury that supplies constitutional standing must be the same as the injury within the requisite 'zone of interests' for purposes of [statutory] standing." *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1232 (D.C. Cir. 1996). Although we have previously concluded the AICPA has constitutional standing as a competitor, *see AICPA II*, 804 F.3d at 1197-98, we focus here upon a different theory of standing because it clearly is sufficient to confer both constitutional and statutory standing.

8

2014-42 § 4.05(4). Subpart B regulates conflicts of interest, fees, candor before the IRS, and competence. *See* 31 C.F.R. §§ 10.20-.38. In effect, the Program extends the scope of Circular 230 to participating unenrolled preparers, including those employed by members of the AICPA.

The expanded coverage of Circular 230 triggers another provision in the Circular that applies to supervisors, including members of the AICPA:

> Any individual subject to the provisions of [Circular 230] who has ... principal authority and responsibility for overseeing a firm's practice governed by [Circular 230], ... must take reasonable steps to ensure that the firm has adequate procedures in effect for all members, associates, and employees for purposes of complying with subparts A, B, and C of [Circular 230], as applicable.

31 C.F.R. § 10.36(a). By applying Circular 230 to a new class of employees, the Program expands the supervisory responsibilities of members of the AICPA. A supervisor who fails to discharge that responsibility "will be subject to discipline," *id.* § 10.36(b), which can include censure, suspension, disbarment, disqualification, or monetary penalties." *Id.* §§ 10.50(a)-(c).

In sum, the Program increases the supervisory responsibility and hence the potential liability faced by members of the AICPA. This is an actual and particularized injury, fairly traceable to the Program, that could be redressed by a favorable judicial decision. *See Lujan*, 504 U.S. at 560-61.

## 2. Statutory Standing

The AICPA's supervisory grievance also establishes its statutory standing under the zone of interests test. That test determines "who may invoke the cause of action in" a particular statute. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1388-89 (2014). "The essential inquiry is whether Congress intended for a particular class of plaintiffs to be relied upon to challenge agency disregard of the law." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987) (internal quotation marks omitted). "The test is not meant to be especially demanding." *Id.*

For any given grievance, we assess the zone of interests using a three part test. We (a) identify the relevant statute, (b) determine the zone of interests it implicates, and then (c) decide whether the plaintiff's grievance is "arguably within the zone of interests to be protected or regulated by the statute." *Clarke*, 479 U.S. at 396. This last part requires us to distinguish between two distinct constituencies — protected parties, who "have the incentive to ensure that the agency protects them to the full extent intended by Congress," and regulated parties, who "have the incentive to guard against any administrative attempt to impose a greater burden than that contemplated by Congress." *Hazardous Waste Treatment Council v. Thomas*, 885 F.2d 918, 922 (D.C. Cir. 1989) (citing *Clarke*, 479 U.S. at 397, 399). Our concern in this case is with the AICPA as a regulated party.

The AICPA argues the agency failed to cite any statutory authority for establishing the Program, so the APA is the relevant statute here. This is clearly wrong. As the IRS points out, the APA creates a cause of action for one "aggrieved by agency action within the meaning of a relevant statute." 5

U.S.C. § 702.  The "relevant statute" is the statute defining "the zone of interests to be protected or regulated," *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970), specifically, "the substantive provisions" of the relevant statute, "the alleged violations of which serve as the gravamen of the complaint," *Bennett v. Spear*, 520 U.S. 154, 175 (1997).   Not surprisingly, therefore, in all the zone of interest decisions the AICPA cites, the relevant zone of interest was defined by a substantive statute, not by the APA.  *See, e.g.*, *Lexmark*, 134 S. Ct. at 1387 (Lanham Act); *Match-e-be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224-25 (2012) (Indian Reorganization Act); *Clarke*, 479 U.S. at 755 (Bank Service Corporation Act); *Amgen, Inc. v. Smith*, 357 F.3d 103, 109 (D.C. Cir. 2004) (Medicare Act).  In this case, the relevant statute, upon which both sides focus their arguments, is 31 U.S.C. § 330(a):

> [T]he Secretary of the Treasury may—
> (1)  regulate the practice of representatives of persons before the Department of the Treasury; and
> (2)  before admitting a representative to practice, require that the representative demonstrate—
> (A)  good character;
> (B)  good reputation;
> (C)  necessary qualifications to enable the representative to provide to persons valuable service; and
> (D)  competency to advise and assist persons in presenting their cases.

Having identified the relevant statute, we must next determine the zone of interests it protects or regulates.  The

AICPA argues § 330(a) establishes three zones of interest, one limiting IRS interference in the market for tax preparation services, a second protecting taxpayers from harmful practices by tax preparers, and a third regulating tax return preparers. For its part, the IRS argues § 330(a) protects taxpayers but not the firms who serve them.

We conclude § 330(a) protects taxpayers and, in so doing, authorizes the Secretary of the Treasury (of which the IRS is a component) to regulate the practice of agents who represent taxpayers before the IRS. By its terms § 330(a) authorizes the Secretary to regulate the qualifications of agents who practice before it. Two of the required qualities – "good character" and "good reputation" – bespeak a purpose to protect both the agency and taxpayers from dishonest representatives. The other two qualifications evince a clear purpose to protect taxpayers by referencing the provision of "valuable service" to taxpayers while "presenting their cases." § 330(a)(2)(C)-(D).

Having determined the zone of interests protected or regulated by § 330(a), we must decide whether the AICPA's injury falls within it. The AICPA argues its members are injured by the Program directly in their capacity as employers of unenrolled agents, who are now subject to, and can subject their employers to sanctions for violations of, Circular 230. The IRS argues AICPA members are not regulated by the Program and therefore have no interest in avoiding regulation. We disagree; as we explained when assessing the AICPA's constitutional standing, the Program regulates AICPA members, albeit indirectly, by imposing supervisory duties on them.

We conclude the grievance of AICPA members that employ unenrolled preparers falls within the zone of interests regulated by the statute. Like the trade association in

*Hazardous Waste Treatment Council*, the AICPA's members "have the incentive to guard against any administrative attempt to impose a greater burden than that contemplated by Congress." *Hazardous Waste Treatment Council*, 885 F.2d at 922; *see also Clarke*, 479 U.S. at 399 (reviewing cases in which a plaintiff had statutory standing because it was "itself the subject of the contested regulatory action"). Here, the AICPA, on behalf of its members, seeks to guard against what it views as an expansion of the IRS's regulatory authority and, concomitantly, of AICPA members' supervisory responsibility, beyond the bounds authorized by the Congress. Therefore, the AICPA's grievance as employers is within the zone of interests regulated by § 330(a). Because the AICPA has a grievance that supplies both constitutional and statutory standing, we need not consider its alternative argument that it has statutory standing by virtue of its members' grievance as competitors to unenrolled preparers with a credential issued by the IRS.

## B. Merits

Having established that the AICPA has both constitutional and statutory standing to challenge the Program, we must decide whether to remand this case to the district court or to proceed ourselves to the merits. Although our "general practice" is to remand the case when we reverse the district court's denial of standing, it may be appropriate to address the merits when the parties have "fully briefed the issue before this court," the merits "involve purely legal questions," which we would review de novo in a subsequent appeal, "[t]he district court has no comparative advantage in reviewing the agency action" for compliance with applicable law, and therefore "[a] remand to the district court would be a waste of judicial resources." *Mendoza v. Perez*, 754 F.3d 1002, 1020 (D.C. Cir.

2014). Because each of these conditions obtains here, we proceed to the merits of the dispute.

## 1.    Statutory Authority

The AICPA argues the Program is beyond the statutory authority delegated by the Congress to the Secretary of the Treasury, and hence to the IRS. The IRS responds that the Program is authorized by two statutes, 31 U.S.C. § 330(a) and 26 U.S.C. § 7803(a)(2)(A). As we have seen, § 330(a) authorizes the IRS to "[r]egulate the practice of representatives of persons before the [agency]" and to admit to practice only individuals of good character and good reputation, who have the necessary qualifications and competence. Section 7803(a)(2)(A) grants the Commissioner of the IRS "the power to administer, manage, conduct, direct, and supervise the execution and application of the internal revenue laws or related statutes," which obviously includes § 330(a).

Consistent with its authority under § 330(a), and contrary to the AICPA's argument, the IRS uses the education, testing, and certification portions of the Program to ensure the unenrolled preparers who participate demonstrate the qualifications and competence necessary to practice before the agency. The Program specifies the education and testing requirements in detail, including the subject matter, number of instructional hours per year, form of testing, and minimum passing grade. REV. PROC. 2014-42 § 4.05. These requirements implement the IRS's stated purpose of encouraging unenrolled preparers "to complete continuing education courses for the purpose of increasing their knowledge of the law relevant to federal tax returns," *id.* § 1, consistent with its reasonable view that an "unenrolled tax return preparer who successfully completes continuing education courses related to federal tax law will generally have

a better understanding of the tax law necessary to represent a taxpayer before the IRS during an examination" than one who has not. *Id.* § 2.

The AICPA raises two objections. First, the AICPA argues the Program relies upon § 330(a) for authority to regulate the business of tax preparation, contrary to our decision in *Loving III*, 742 F.3d at 1017-18. More specifically, the AICPA suggests that making "the law relevant to federal tax returns," REV. PROC. 2014-42 § 1, a subject of continuing education betrays an improper intent to regulate tax preparation.

We see nothing in the Program that attempts to resurrect regulations of the type enjoined in the *Loving* decisions. Unenrolled tax preparers who participate in the program "consent to be subject to the duties and restrictions relating to practice before the IRS in [certain sections of] Circular 230," *id.* § 4.05(4); they do not consent to be governed by Circular 230 insofar as they are engaged in the business of tax preparation.

The Program also ties violations of Circular 230 to the limited practice right, not to the preparation of tax returns: Record of Completion holders "who violate Circular 230 *during the course of [their] representation [before the IRS]* will have their Record of Completion and ability to represent a taxpayer before the IRS under this revenue procedure revoked." *Id.* § 7.01(2). When seen in this light, it is clear that the participants' commitment to follow Circular 230 is coextensive with the IRS's authority under § 330(a) to regulate practice before it.

Second, the AICPA argues that because the IRS "initially relied on Section 330 only as statutory authority 'for Section

6'" of the Program, which permits limited representation by holders of a Certificate of Completion, the IRS waived its argument that § 330(a) authorizes any other aspect of the Program. The AICPA relies solely upon a case in which we held a petitioner had waived an argument that "was never raised in either the rulemaking comments or the petitioners' opening appellate brief." *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1040 (D.C. Cir. 2012). There, the argument was raised for the first time in the appellant's reply brief. *Id.* Here, the IRS raised its argument both before the district court, where it argued – in the sentence immediately after the one to which the AICPA refers - that "Section 330 provides sufficient authority for the [Annual Filing Season Program]," Def.'s Mem. Supp. Summ. J. at 17, *AICPA III*, No. 14-1190 (D.D.C. Apr. 4, 2016), ECF No. 33, and in its opening brief on appeal. Thus did it preserve the argument.

Another statute merits brief mention. The IRS also claims authority for the Program under 26 U.S.C. § 7803(a)(2)(A), which authorizes it to "administer ... the execution and application of the internal revenue laws or related statutes." *Id.* We agree with the AICPA that this statute confers no additional substantive authority. *See New England Power Co. v. Fed. Power Comm'n*, 467 F.2d 425, 430-31 (D.C. Cir. 1972) (addressing two statutes found to be "of an implementary rather than substantive character" because they "merely augment existing powers conferred upon the agency by Congress"). Section 7803(a)(2)(A) is, however, relevant to the case because it is what authorizes the IRS to publish the public directory of individuals who hold a Record of Completion, an administrative step analytically distinct from the creation of the published data. *See, e.g.*, *Chem. Mfrs. Ass'n v. EPA*, 28 F.3d 1259, 1263 (D.C. Cir. 1994) (distinguishing between the classification of a substance as a carcinogen and the listing of that classification in a publicly available agency database).

In sum, § 330(a) authorizes the IRS to establish and operate the Program, and § 7803(a)(2)(A) authorizes the agency to publish the results of the Program.

## 2. Procedural Requirements

Having determined that the IRS had the authority to adopt the Program, we must next consider the AICPA's contention that the IRS did not follow the applicable procedure in issuing the Revenue Procedure. The AICPA argues the Revenue Procedure is a legislative rule and therefore had to be adopted through notice and comment rulemaking pursuant to the APA, 5 U.S.C. § 553.

At the outset we note an agency action constitutes a legislative rule only if "the agency action binds private parties or the agency itself with the 'force of law,'" *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 382 (D.C. Cir. 2002) (internal quotation marks omitted) and "an agency pronouncement will be considered binding as a practical matter if it either appears on its face to be binding ... or is applied by the agency in a way that indicates it is binding." *Id.* at 383; *cf. Chamber of Commerce v. U.S. Dep't of Labor,* 174 F.3d 206 (D.C. Cir. 2007). In this case the Revenue Procedure and associated Program do not bind unenrolled preparers at all; the Program merely provides an opportunity for those unenrolled preparers who both choose to participate and satisfy its requirements. Nor does it impose any new or different requirement upon supervisors or unenrolled agents; Circular 230 bound

supervisors and unenrolled agents before the Program took effect and continues to bind them now.[2]

Nonetheless the AICPA argues the Revenue Procedure is a legislative rule because it withdraws a benefit, to wit, the right of all unenrolled preparers to practice before the IRS, which right had been created through notice and comment rulemaking. True it is that a rule promulgated by notice and comment ordinarily should be amended by notice and comment. *See, e.g.*, *Consumer Energy Council of Am. v. FERC*, 673 F.2d 425, 446 (D.C. Cir. 1982), *aff'd*, 463 U.S. 1216 (1983). It is also true that *Loving* enjoined the 2011 rule that abolished the limited practice right, thereby restoring the *status quo ante*. Yet, as the AICPA points out, the limited practice afforded unenrolled preparers before 2011 was the product of Revenue Procedure 81-38, which – like Revenue Procedure 2014-42 – was issued without notice and comment.[3]

---

[2] Our dissenting colleague claims the Program imposes significant new obligations upon unenrolled preparers and their supervisors because it makes subpart B of Circular 230, 31 C.F.R. Pt. 10, applicable to unenrolled preparers not only when they practice before the IRS, but also in "aspects of tax *preparation*." Diss. at 6. On closer inspection, however, it is clear that the Program does not extend Circular 230 to cover the mere preparation of a tax return. Subpart B concerns only "duties and restrictions relating to practice before the Internal Revenue Service." Because subpart B addresses only practice before the IRS, an unenrolled agent's agreement to be subject to subpart B "as applicable" does not extend Circular 230 to the preparation of a tax return. As the IRS stated in its brief, "the program does not attempt to regulate tax-return preparers along the lines of the invalidated 2011 regulations." IRS Br. at 56.

[3] Our dissenting colleague would hold the Program could be adopted only after notice and comment rulemaking because it alters the limited practice right established in 1959 after notice and comment.

Finally, the AICPA argues the Revenue Procedure must be a legislative rule by process of elimination. Specifically, it argues the Revenue Procedure cannot be an interpretive rule, a procedural rule, or a policy statement, all of which may be adopted without notice and comment.

---

*See* Diss. at 6-9 (*citing* Appearance of Unenrolled Preparers of Returns, 24 Fed. Reg. 1157 (Jan. 29, 1959) (final rule)). Our colleague's focus upon the 1959 rule is misplaced, we think, for two reasons. First, as we explain below, the Program interprets the term "competency" in 330(a), the statutory authority to exclude practitioners – *i.e.*, those admitted through the limited practice right – who do not demonstrate the statutorily-mandated qualifications. In other words, the limited practice right established by the 1959 legislative rule is constrained not by the Program but by an Act of Congress, § 330(a). That the concept of competency appears in both the relevant statute and a legislative rule does not *ipso facto* require the agency to promulgate a legislative rule every time it seeks to interpret the relevant statute.

Second, taking our colleague's invitation to focus upon what the Program actually says, *see, e.g.*, Diss. at 11-13, it is difficult to see how the Program "amends a legislative rule," *id.* at 6, *viz.* the 1959 rule, of which it makes no mention while, by its terms, the Program "modifies and supersedes Revenue Procedure 81-38," *see* REV. PROC. 2014-42, § 1 (*citing* REV. PROC. 81-38, 1981-35 I.R.B. 12), the several predecessors of which stretch back to 1959. *See, e.g.*, REV. PROC. 68-20, 1968-1 C.B. 812 (1968); REV. PROC. 59-3, 1959-1 C.B. 801 (1959). The dissent muses that the IRS "perhaps mistakenly" issued Revenue Procedure 81-38 without a notice and comment rulemaking, Diss. at 8; if so, then the agency has been mistakenly issuing this sequence of revenue procedures for almost sixty years.

The AICPA first argues the rule cannot be an interpretive rule – or, implicitly, anything else other than a legislative rule – because § 330(a) is permissive, using the word "may" to grant the IRS the authority to issue implementing regulations, which still must be promulgated through notice-and-comment rulemaking. The proposition that an agency must use notice-and-comment rulemaking whenever the operative statute permits ("may regulate") – but does not require – it to regulate is, to say the least, novel. The only authority the AICPA cites involved rules disguised as "guidance letters" that in fact "supplement[ed] the statute by imposing specific duties" on the plaintiffs. *Mendoza*, 754 F.3d at 1021-22.

The AICPA also argues the Revenue Procedure cannot be an interpretive rule, and in its view therefore must be a legislative rule, because it "contains not a word of the reasoned statutory interpretation ... that typifies an interpretative rule." We disagree, although we acknowledge the agency could have been more clear. By clarifying how an unenrolled preparer seeking to practice before the IRS may "demonstrate ... necessary qualifications ... and competency" within the meaning of § 330(a), the Revenue Procedure "reflects an agency's construction of a statute that has been entrusted to the agency to administer." *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997); *see Interport Inc. v. Magaw*, 135 F.3d 826, 828-29 (D.C. Cir. 1998) (holding a rule interpretive where "it explains more specifically what is meant" in another authority, in that case a legislative rule). As stated above, the Program requires unenrolled preparers who want to participate to complete a set number of hours of instruction, on specific topics, and pass a test before gaining the limited practice right. *See* REV. PROC. 2014-42 §§ 4, 6. Those requirements are the

agency's interpretation of what § 330(a) means by "competency" and the other criteria it lists.[4]

Because we conclude the Revenue Procedure is an interpretive, not a legislative, rule, we hold the IRS did not violate the APA by failing to follow notice-and-comment rulemaking procedures in promulgating it.

---

[4] We also disagree with the dissent's assertion that the term "competency" is "ordinarily" too vague to be interpreted, *see* Diss. at 13, for three reasons. First, the cases cited are inapplicable. In *Catholic Health Initiatives v. Sebelius*, we held the statutory term "reasonable cost" too vague to interpret because "reasonable" is a "vague or vacuous term[]." 617 F.3d 490, 495-96 (D.C. Cir. 2010). In *Paralyzed Veterans of America v. D.C. Arena L.P.*, we more generally disapproved interpreting "very general … terms like 'equitable' or 'fair.'" 117 F.3d 579, 588 (D.C. Cir. 1997). Competency is not a similarly broad term. Second, in a somewhat analogous situation a sister circuit has held "competency" is amenable to interpretation. *See Premysler v. Lehman*, 71 F.3d 387, 388 (Fed. Cir. 1995) (holding agency rule imposing competency requirements is an interpretive rule because it clarified requirements in a statute and associated legislative rule that practitioners before the agency show they "are possessed of the necessary qualifications" sufficient to "enable him or her to render applicants for patents valuable service"); *see also Sperry v. Florida ex rel. Florida Bar*, 373 U.S. 379, 384-85 (1963) (summarizing the same statute and regulation). Third, and perhaps most important, the statute facilitates interpretation by describing the specific type of competency a prospective representative should demonstrate, namely, "competency to advise and assist persons in presenting their cases," 31 U.S.C. § 330(a)(2)(D), and qualifications "necessary … to enable the representative to provide to persons valuable service," *id.* at § 330(a)(2)(C).

### 3. Arbitrary and Capricious Review

Finally, the AICPA argues the Program is arbitrary and capricious. In entertaining this claim, our review "is narrow," for "a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The agency must have "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* (internal quotation marks omitted).

First, the AICPA argues that we must vacate the Program if in adopting it the IRS "entirely failed to consider an important aspect of the problem" it was addressing. *Id.* Specifically, the AICPA argues the IRS did not respond to its concern, before implementing the Program, that a public database of provider credentials may confuse taxpayers. The AICPA expressed these concerns in a July 6, 2011 letter to the IRS and again in its July 28, 2011 congressional testimony. The AICPA argued then that "any public database developed by IRS that is designed to serve as a 'look-up' function where taxpayers may search for their preparer should be structured to mitigate any taxpayer confusion regarding the relative qualifications of the different classes of tax return preparers." *The Implementation of the IRS Paid Tax Return Preparer Program: Hearing Before the Subcomm. on Oversight of the H. Comm. on Ways and Means*, 112th Cong. 52 (2011) (statement of Patricia Thompson).

The IRS responds that the directory does what the AICPA requested, and indeed it does: It allows users to filter the directory to show each category of service provider separately, including those identified in the directory as "Annual Filing

Season Program Participant[s]." *See* IRS, Directory of Federal Tax Return Preparers with Credentials and Select Qualifications, https://irs.treasury.gov/rpo/rpo.jsf (last accessed May 6, 2018). The directory is also linked to a primer describing the various qualifications in greater detail. *See* IRS, Understanding Tax Return Preparer Credentials and Qualifications, https://www.irs.gov/tax-professionals/understanding-tax-return-preparer-credentials-and-qualifications (last accessed May 6, 2018). These features indicate the IRS considered and addressed the AICPA's comment.

Second, the AICPA argues the IRS violated its obligation under the APA to "consider all reasonable alternatives presented to it." *LaClede Gas Co. v. FERC*, 873 F.2d 1494, 1498 (D.C. Cir. 1989). In particular, the AICPA points to a June 24, 2014 letter it submitted to the IRS in the wake of the *Loving* litigation, suggesting the agency had ample authority to punish "unethical or fraudulent tax return preparers" without adopting the Program. Nowhere in those comments, however, did the AICPA propose an alternative way to deal with the problem of incompetent tax preparers and taxpayers who cannot tell whether an uncredentialed tax preparer is or is not competent. We cannot fault the IRS for failing to consider an alternative that was not addressed to the problem with which it was concerned.

### III. Conclusion

For the reasons stated above, we hold the AICPA has standing to sue but the IRS prevails on the merits of the case. Accordingly, we remand the case to the district court for the purpose of entering judgment for the IRS.

*So ordered.*

GRIFFITH, *Circuit Judge*, concurring in part and dissenting in part: I agree with all of the majority opinion except for its conclusion in Part II.B.2 that the IRS could lawfully issue the Annual Filing Season Program without public notice and comment.

I

Whenever an agency engages in "rule making," it generally must notify the public of the substance of the proposed rule and provide interested persons opportunity to comment. 5 U.S.C. § 553(b)(1)-(3), (c). "Rule making" is defined in the APA to include any "agency process for formulating, amending, or repealing a rule." *Id.* § 551(5). And a "rule" is defined as an "agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency." *Id.* § 551(4). This definition of "rule" is broad. So broad, in fact, that it "include[s] nearly every statement an agency may make" and "the breadth of this definition cannot be gainsaid." *Batterton v. Marshall*, 648 F.2d 694, 700 (D.C. Cir. 1980). Neither the majority nor the IRS disputes that the Program falls within this broad definition.

The APA's notice-and-comment requirements do not, on their face, apply to any single type of rule. Instead, they apply to "rules" generally. *See* 5 U.S.C. § 553(b)-(c). Therefore, as a default, *any* agency rule may be promulgated only after public notice and opportunity for comment. The only types of rules excluded from notice and comment are those expressly excepted: "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." *Id.* § 553(b)(3)(A). Only if a rule falls into one of these three categories can it escape the APA's notice-and-comment requirements.

2

II

The most common administrative rules requiring notice and comment are "legislative" or "substantive" rules. *See, e.g.*, *Mendoza v. Perez*, 754 F.3d 1002, 1021 (D.C. Cir. 2014). Stated most succinctly, the defining characteristic of a legislative rule is that it carries the "force and effect of law." *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1020 (D.C. Cir. 2000). A valid legislative rule is therefore a "binding rule of law not subject to challenge in particular cases." *Pac. Gas & Elec. Co. v. Fed. Power Comm'n*, 506 F.2d 33, 39 (D.C. Cir. 1974). Therefore, when an agency "expresses a change in substantive law or policy (that is not an interpretation) which the agency intends to make binding, or administers with binding effect," its action "must observe the APA's legislative rulemaking procedures." *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 382-83 (D.C. Cir. 2002) (internal quotation marks omitted).

The majority concludes that the Program lacks these attributes of a legislative rule. I disagree.

A

The majority begins its analysis by determining whether the Program carries the force of law. Maj. Op. at 16-17. The majority concludes that the Program does "not bind unenrolled preparers" because it "merely provides an opportunity for those unenrolled preparers who both choose to participate and satisfy its requirements." *Id.* at 16. In other words, because the Program creates obligations only for those who voluntarily participate in the Program, it is not legislative in character.

Even assuming that this voluntary aspect of the Program means that it does not bind participating unenrolled preparers, the majority's analysis overlooks at least two other classes of

regulated entities affected by the Program's existence: supervisors and non-participating unenrolled preparers.

As the majority recognizes in its standing analysis, the Program substantially affects the interests of those who supervise unenrolled preparers. *Id.* at 7 ("Some members of the AICPA are injured by the Program because it imposes new supervisory responsibilities on them."). When an unenrolled preparer voluntarily participates in the Program, he consents to being subject to the "duties and restrictions relating to practice before the IRS" in Circular 230. Rev. Proc. 14-42, § 4.05(4). This triggers another provision in Circular 230 applying to supervisors, who must then "take reasonable steps" to ensure that participating unenrolled preparers comply with the Circular. 31 C.F.R. § 10.36(a). Any supervisor that fails to fulfill that duty "will be subject to discipline," *id.* § 10.36(b), including suspension, disbarment, disqualification, or monetary penalties, *id.* § 10.50(a)-(c); *see also* Maj. Op. at 8 (discussing the Program's adverse effects on supervisors).

Therefore, supervisors—who do not affirmatively choose to "participate" in the Program, Maj. Op. at 16—can be subject to discipline as severe as monetary penalties. Legislative rules "grant rights" or "impose obligations" on private interests, *Batterton*, 648 F.2d at 701-02, or otherwise "effect[] a substantive . . . change to the . . . regulatory regime," *Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 653 F.3d 1, 6-7 (D.C. Cir. 2011) (Ginsburg, J.). By expanding the coverage of Circular 230 and imposing the Circular's obligations on supervisors of participating unenrolled preparers, the Program changes the regulatory regime. These supervisors, at least, have new duties and obligations. Such an effect makes the Program a quintessential legislative rule; that unenrolled preparers participate in the Program by choice does not diminish its mandatory regulatory effect on others.

The majority also fails to appreciate the Program's unquestionable effect on non-participating unenrolled preparers. Before the Program, an unenrolled preparer could represent taxpayers before IRS examining officers, subject to a relatively narrow set of exceptions. *See* Rev. Proc. 81-38, § 9.01. After the Program, however, unenrolled preparers who do not participate are not permitted to practice before the IRS. *See* Rev. Proc. 14-42, § 6.02. If a non-participating unenrolled preparer now attempts to represent a taxpayer before the IRS, he will likely be turned away by the examining officer.

But if that preparer proceeds to represent the taxpayer anyway, he will be subject to sanctions under Circular 230. Even though the Program implies that only participating preparers will be subject to the duties and restrictions in Circular 230, *id.* § 4.05(4), that is only because the Program limits the universe of unenrolled preparers who represent taxpayers before the IRS to Program participants. There is no reason to think the Program exempts from discipline preparers who represent taxpayers without authorization. Since at least 1981, the IRS has subjected all unenrolled preparers who appear before the agency to § 10.51 of Circular 230. *See* Rev. Proc. 81-38, § 7.01. And § 10.51 prohibits the willful representation of taxpayers before the IRS without the Service's authorization. *See* 31 C.F.R. § 10.51(a)(18). A non-participating preparer who represents a taxpayer after the Program's effective date will violate § 10.51 and be subject to sanctions that include censure, suspension, disbarment, and monetary penalties. *See id.* § 10.50(a)-(c).

In sum, non-participating unenrolled preparers are prohibited from representing taxpayers before the IRS, and that prohibition is backed up by significant penalties. The Program thus imposes a new "obligation[]," "prohibition[]," or

"requirement[]" on unenrolled preparers who seek to represent taxpayers before the IRS and avoid participation in the Program. *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 252 (D.C. Cir. 2014). It is a legislative rule.

The majority resists this conclusion by claiming that the Program imposes no "new or different" requirements because "Circular 230 bound supervisors and unenrolled [preparers] before the Program took effect." Maj. Op. at 16-17. But this does not withstand careful scrutiny. The Program requires participating unenrolled preparers to consent to be subject to "subpart B and section 10.51 of Circular 230." Rev. Proc. 14-42, § 4.05(4). Although unenrolled preparers have had to comply with § 10.51 of Circular 230 since at least 1981, *see* Rev. Proc. 81-38, § 7.01, *only* by participating in the Program are unenrolled preparers subject to the entirety of subpart B, which includes a host of additional duties not included in § 10.51.

And even if those duties in subpart B are voluntarily assumed by participating preparers, they involuntarily change the supervisory obligations imposed on AICPA members. Under Circular 230, AICPA members "must take reasonable steps to ensure" that they have "adequate procedures in effect for all . . . employees for purposes of complying with subparts A, B, and C of [Circular 230], *as applicable*." 31 C.F.R. § 10.36 (emphasis added). But for the Program, subpart B of Circular 230 would not be "applicable" to any unenrolled preparer, even if the preparer represented taxpayers before the IRS pursuant to Revenue Procedure 81-38. *See* Maj. Op. at 8 (explaining that the Program "extends the scope of Circular 230 to participating unenrolled preparers"). And because of the Program, AICPA members must supervise unenrolled preparers' adherence to portions of Circular 230 that never before regulated them.

The majority also errs by claiming that the Program does not subject the tax preparation practice of unenrolled preparers to subpart B. *Id.* at Maj. Op. at 17 n.2. Participating preparers are "subject to the duties and restrictions relating to practice before the IRS in subpart B and § 10.51." Rev. Proc. 14-42, § 4.05(4). And subpart B regulates aspects of tax preparation. *See, e.g.*, 31 C.F.R. § 10.22(a) (requiring practitioners to "exercise due diligence" when "preparing or assisting in the preparation of, approving, and filing tax returns"); *id.* § 10.34(a) (describing actions that may not be taken when preparing tax returns). Never before have unenrolled preparers been subject to Circular 230 except for § 10.51, and then only when they "s[ought] to represent taxpayers . . . before [IRS] examining officers." Rev. Proc. 81-38, § 3. Before the Program, supervisors of unenrolled preparers who did only tax preparation had no Circular 230 supervisory duties. Now, those duties apply to supervisors of all participating unenrolled preparers.

At bottom, the majority is mistaken to claim that supervisors are not subject to "new or different" supervisory requirements under the Program. Maj. Op. at 16. The new duties imposed on some unenrolled preparers necessarily impose "new substantive burdens" on their supervisors. *Aulenback, Inc. v. Fed. Highway Admin.*, 103 F.3d 156, 169 (D.C. Cir. 1997).

B

The Program also takes away from non-participating unenrolled preparers their limited right to practice before the IRS, which was first granted in 1959 after notice-and-comment rule making. And any agency action that revokes or amends a legislative rule is itself a legislative rule. *Am. Mining Congress*

*v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1112 (D.C. Cir. 1993). The majority argues instead that this limited practice right was created by Revenue Procedure 81-38, which was issued without notice and comment in 1981. Maj. Op. at 17. But the majority overstates the importance of Revenue Procedure 81-38 in defining preparers' representation rights.

In 1959, the Department of Treasury first granted unenrolled preparers the right to practice before the IRS. *See* Appearance of Unenrolled Preparers of Returns, 24 Fed. Reg. 1157, 1157-58 (Feb. 14, 1959). When granting that right, the Department also specified that these unenrolled preparers would be "subject to such rules regarding standards of conduct, the extent of their authority, and other matters as the [IRS] *shall prescribe*." *Id.* at 1158 (emphasis added). Finally, the regulation announced that the "circumstances and conditions under which an unenrolled preparer . . . may appear as the taxpayer's representative . . . will be published in the Internal Revenue Bulletin." *Id.*

The 1959 regulation's use of the verb "prescribe" is telling. To "prescribe" is to "lay down rules [and] laws," or to "lay down as a rule or direction to be followed" or "impose authoritatively." *Oxford English Dictionary* (3d ed. 2007), http://www.oed.com/view/Entry/150644. When referring to law, "prescribe" means that the law has "force or power." *Id.* And to "prescribe" some law or policy is not synonymous with "interpreting" law or policy. *See* 5 U.S.C. § 551(4) (defining a "rule" as an agency statement designed to "implement, interpret, or prescribe law or policy").

The majority claims that "the limited practice afforded unenrolled preparers . . . was the product of Revenue Procedure 81-38," Maj. Op. at 17, which also purported to "*prescribe* the standards of conduct . . . and the circumstances and conditions

under which" an unenrolled preparer could exercise "the privilege of limited practice" before the IRS, Rev. Proc. 81-38, § 1 (emphasis added). But the practice right of unenrolled preparers was not "the product of" Revenue Procedure 81-38; it was the product of the 1959 regulation. That Revenue Procedure 81-38 refined the practice right created in 1959 does not mean that the practice right itself flowed from Revenue Procedure 81-38. The proper baseline for evaluating the Program's effect on unenrolled preparers is the 1959 regulation. And to the extent that Revenue Procedure 81-38 "prescribed" limitations on unenrolled preparers that could not be inferred from a statute or existing legislative rule, it would be a legislative rule. The fact that the IRS issued Revenue Procedure 81-38 without notice and comment—perhaps mistakenly—does nothing to save the Program. Two wrongs don't make a right.

That said, comparing Revenue Procedure 81-38 to the Program is comparing apples to oranges. On the one hand, Revenue Procedure 81-38 did list certain persons who were "ineligible to exercise the privilege of limited practice" before the IRS. *Id.* § 9.01. But these disqualifications echoed those established through notice-and-comment rule making in Circular 230, which applied to *any* individual, not just unenrolled preparers, who sought to represent taxpayers before the IRS. For example, Revenue Procedure 81-38 excluded "[a]ny individual" who was "under disbarment or suspension from practice as an attorney, certified public accountant, public accountant or actuary" or had been "disbarred or suspended from practice before" the IRS. *Id.* § 9.01(b), (c). These restrictions repeated those made by Circular 230, which excluded "[a]ny individual who [was] under disbarment or suspension from practice before the [IRS] or from practice of his profession by any other authority (in the case of attorneys, certified public accountants, and public accountants)." 31

C.F.R. § 10.7(a)(7) (1970). Similarly, Revenue Procedure 81-38 broadly prohibited officers and employees of the United States and the states from representing taxpayers before the IRS. *See* Rev. Proc. 81-38, § 9.01(g), (h). Again, these restrictions repeated those in Circular 230 and applied to *any* individual seeking to practice before the IRS. *See* 31 C.F.R. § 10.3(f), (g) (1970).

On the other hand, the Program prohibits unenrolled preparers from practicing before the IRS unless they take a course, pass an exam, and complete at least eighteen hours of continuing education. *See* Rev. Proc. 14-42, § 4.05(1)-(3). Nothing remotely similar to these restrictions appears in any IRS regulation promulgated via notice-and-comment rule making. The restrictions in Revenue Procedure 81-38 that repeated the restrictions in Circular 230 did not meaningfully limit the practice right created and defined through the notice-and-comment process. But the same cannot be said of the restrictions imposed by the Program, which substantially change practice requirements and were not drawn from an existing legislative rule.

As such, I cannot agree with the majority that the Program merely amended Revenue Procedure 81-38. I view the Program to effectively amend the practice right first prescribed in 1959 and clarified through notice-and-comment rule making in Circular 230 and its later revisions. When a rule "effectively amends a prior legislative rule . . . we have a legislative . . . rule." *Am. Mining Congress*, 995 F.2d at 1112; *see also Mendoza*, 754 F.3d at 1024. The Program amends a legislative rule, and so it must be a legislative rule.[1]

---

[1] The majority contends that my focus on the 1959 regulation is "misplaced" for two reasons. Maj. Op. at 18 n.3. First, that whatever additional limitations the Program imposed that cannot be derived

10

III

Because the APA's rule making procedures apply by default, *see* 5 U.S.C. § 553(a)-(c), the notice-and-comment requirement applies to the Program unless it is an interpretative rule, policy statement, or procedural rule, *id.* § 553(b)(3)(A). The majority concludes that the Program falls within the exception for interpretive rules, but I remain unpersuaded.

Given the APA's presumption in favor of public participation in rule making, the exceptions to notice and comment are to be "narrowly construed and only 'reluctantly countenanced.'" *Sentara-Hampton Gen. Hosp. v. Sullivan*, 980

_____

from Circular 230 are derived from 31 U.S.C. § 330(a). *Id.* But the Program does much more than interpret the statute, which I explain below. *See infra* Part III. Second, the majority claims that the Program by its own terms "modifies and supersedes Revenue Procedure 81-38," not the 1959 rule. Rev. Proc. 14-42 § 1. But what a rule claims to do is not always what the rule actually does. We've long recognized that agencies cannot mask the legislative character of a rule with a non-legislative label. *See Appalachian Power Co.*, 208 F.3d at 1024 ("It is well-established that an agency may not escape the notice and comment requirements . . . by labeling a major substantive legal addition to a rule a mere interpretation." (citation omitted)); *Office of Commc'n of United Church of Christ v. FCC*, 826 F.2d 101, 105 (D.C. Cir. 1987) ("Since the court reviews not the label but the agency pronouncement that underlies the label, it is that pronouncement itself that governs the determination of its status."). Moreover, the Program's express modification and preemption of Revenue Procedure 81-38 does not rule out the conclusion that the Program *also* implicitly amends the 1959 rule. As explained above, the relevant question is whether the Program "*effectively* amends" the 1959 rule, which does not require it to expressly invoke the rule. *Am. Mining Congress*, 995 F.2d at 1112 (emphasis added).

F.2d 749, 759 (D.C. Cir. 1992) (quoting *Alcaraz v. Block,* 746 F.2d 593, 612 (9th Cir. 1984)); *see also Orengo Caraballo v. Reich*, 11 F.3d 186, 195 (D.C. Cir. 1993) ("Mindful of congressional intent in creating the APA . . . we have been careful to construe § 553(b)(A)'s exceptions to the rulemaking requirements narrowly." (internal quotation marks omitted)); *Am. Bus Ass'n v. United States*, 627 F.2d 525, 528 (D.C. Cir. 1980) ("Congress was alert to the possibility that these [notice-and-comment] exceptions might, if broadly defined and indiscriminately used, defeat the section's purpose. Thus, the legislative history of the section is scattered with warnings that various of the exceptions are not to be used to escape the requirements of section 553.").

To be an interpretive rule, "the rule must be interpreting something." *Cent. Tex. Tel. Co-op., Inc. v. FCC*, 402 F.3d 205, 212 (D.C. Cir. 2005). It must "derive a proposition from an existing document whose meaning *compels* or *logically justifies* the proposition." *Id.* (internal quotation marks omitted) (emphasis added). Put another way, an interpretative rule announces the agency's understanding of what the law means and "reminds affected parties of existing duties." *Interport Inc. v. Magaw*, 135 F.3d 826, 828 (D.C. Cir. 1998) (quoting *Gen. Motors Corp. v. Ruckelshaus*, 742 F.2d 1561, 1565 (D.C. Cir. 1984) (en banc)).

The majority reasons that the Program "reminds" unenrolled preparers of their preexisting duties by interpreting a single word in § 330(a)—"competency." Maj. Op. at 19. According to the majority, the Program's "requirements are the agency's interpretation of what § 330(a) means by 'competency' and the other criteria it lists." *Id.* at 20.

Although the Program may relate to the development of unenrolled preparers' "competency," it is not an *interpretation*

of that word. There is no evidence in the Program of "reasoned statutory interpretation, with reference to the language, purpose and legislative history." *Gen. Motors Corp.*, 742 F.2d at 1565. The majority maintains that the Program reflects the agency's construction of § 330(a), even though the IRS "could have been more clear." Maj. Op. at 19. Clarity is not the problem. The problem is the agency's failure to engage in any identifiable mode of statutory interpretation.

The Program describes the "competency" required from "paid tax return preparers." Rev. Proc. 14-42, § 2. But § 330(a) authorizes regulations for "the *practice* of representatives of persons before the Department of the Treasury." (emphasis added). As we held in *Loving v. IRS*, § 330 does not govern "tax-return preparers . . . when they simply assist in the preparation of someone else's tax return" because they "do not practice *before the IRS*." 742 F.3d 1013, 1018 (D.C. Cir. 2014) (emphasis in original). An interpretation of § 330(a) must aim to clarify the standards of practice before the IRS, not tax preparation. Yet the Program's stated goals are "accurate return preparation, improved tax compliance, effective tax administration, and protecting taxpayers from preparer errors." Rev. Proc. 14-42, § 2. To be sure, the Program also explains that requiring "continuing education courses related to federal tax law" will improve the competency of tax preparers when they represent taxpayers before the IRS. *Id.* But this reads like an afterthought, not like the basis for the Program's entry requirements.

More revealing is the Program's failure to link those requirements to the "competency" standard in § 330(a). The Program cites § 330(a) once. It includes no hint of the agency's attempt to engage with the provision's language, much less an explanation of how the provision "compels or logically justifies" a requirement that tax-return preparers take

continuing education courses in tax law. *Cent. Tex. Tel. Co-op.*, 402 F.3d at 212.

Nor does the Program indicate how its requirements merely "remind[] affected parties of existing duties," *Gen. Motors Corp.*, 742 F.2d at 1565, especially in light of the fact that § 330(a) does not impose any duties itself. Instead, it authorizes the Treasury Secretary to establish duties to promote "competency," among other virtues. Congress may have delegated to IRS the power to impose such duties, but only after the agency "provid[es] adequate notice and comment." *Fertilizer Inst. v. EPA*, 935 F.2d 1303, 1308 (D.C. Cir. 1991).

Further, "competency" in § 330(a) is a "vague or vacuous term[]—such as 'fair and equitable,' 'just and reasonable,' 'in the public interest,' and the like," and "the process of announcing propositions that specify applications of those terms is not ordinarily one of interpretation." *Catholic Health Initiatives v. Sebelius*, 617 F.3d 490, 495 (D.C. Cir. 2010) (internal quotation marks omitted). Interpretation is difficult because "those terms in themselves do not supply substance from which the propositions can be derived." *Id.* So even if the Program were an attempt to interpret "competency," the result would be "a substantive regulation." *Paralyzed Veterans of Am. v. D.C. Arena L.P.*, 117 F.3d 579, 588 (D.C. Cir. 1997) ("If the statute or rule to be interpreted is itself very general, using terms like 'equitable' or 'fair,' and the 'interpretation' really provides all the guidance, then the latter will more likely be a substantive regulation.").[2]

---

[2] I do not contend that "competency" may never serve as the basis of an interpretive rule. *See* Maj. Op. at 20 n.5. The word "competency" is certainly "amenable to interpretation," *id.*, as are other general words like "equitable," "fair," and "reasonable," *see Catholic Health Initiatives*, 617 F.3d at 495 (explaining that specific

14

The distinction between interpretative and legislative rules "turns on how tightly the agency's interpretation is drawn linguistically from the actual language of the statute." *Id.* The Program's specific requirements for demonstrating competency—including continuing education and a comprehension test—are not tightly drawn from the language of § 330(a), which provides little concrete guidance. And the other criteria for representation listed in § 330(a) are similarly indefinite. *See* 31 U.S.C. § 330(a)(2)(A)-(C) (listing "good character," "good reputation," and "necessary qualifications . . . to provide . . . valuable service"). None of these criteria supplies a basis for the Program's specific application.[3]

applications of general terms are "ordinarily" not interpretative). My critique is not that the IRS cannot interpret "competency" to mean something more specific. Instead, I read the Program—with its precise and rigid requirements—as too loosely "drawn linguistically from the actual language of" § 330. *Paralyzed Veterans*, 117 F.3d at 588. The question is one of degree, not of kind. Perhaps the IRS could have issued a less categorical, less absolute, and more general regulation that would have been an interpretation, but it did not.

[3] The majority's appeal to the Federal Circuit's decision in *Premysler v. Lehman*, 71 F.3d 387 (Fed. Cir. 1995), is unavailing. *See* Maj. Op. 20 n.5. I agree that the statute in *Premysler* shares common features with § 330(a). For example, under § 330 the Secretary of the Treasury "may require" practicing individuals to demonstrate, among other things, "necessary qualifications" and "competency to advise and assist persons in presenting their cases." § 330(a)(2)(C), (D). Likewise, at the time of *Premysler*, 35 U.S.C. § 31 (1995) authorized the Commissioner of Patents to "require" any representative before the Patent and Trademark Office (PTO) to show that he was "possessed of the necessary qualifications to render applicants or other persons valuable service, advice, and assistance." In response, the Commissioner established a qualification exam. *Premysler*, 71 F.3d at 388. However, the examination requirement was promulgated *after notice and comment*. *See* Practice Before the

15

Patent and Trademark Office, 50 Fed. Reg. 5158, 5174 (Feb. 6, 1985) (codified at 37 C.F.R. § 10.7(b) (1995)). Therefore, to the extent that the examination requirement was a reasonable implementation of 35 U.S.C. § 31's competency provision, apparently the Commissioner did not think that the language of the statute alone sufficed to impose that requirement because he invoked his substantive rule making authority to do so. If anything, this feature of *Premysler* highlights how unusual it is for an agency to invoke its interpretive authority, rather than its legislative authority, to justify an examination requirement.

The regulation upheld as non-legislative in *Premysler* is also readily distinguishable from the Program. The PTO's guidance described "criteria that are *generally* sufficient to show technical competence qualifying an individual to sit for the examination." *Premysler*, 71 F.3d at 388 (emphasis added). Importantly, the PTO's bulletin stated that its understanding of "competency" was "not dispositive in determining whether an applicant may sit for the PTO examination." *Id.* at 390. On the contrary, in *Premysler* the Commissioner himself found that a lower-ranked official "improperly based his decision" rejecting Premysler's application to sit for the examination "solely on the categories" of competence set forth in the bulletin. *Id.* at 389. The Commissioner ultimately "undertook a review of Mr. Premylser's qualifications *without regard* for the [bulletin]." *Id.* at 390 (emphasis added). As the Federal Circuit concluded, the bulletin, "alone, d[id] not prevent anyone from taking the examination." *Id.* Therefore, to whatever extent the Federal Circuit upheld the PTO's bulletin as an "interpretation" of a competency-related statutory provision, it did so largely because the bulletin set forth rebuttable guidelines, rather than strict requirements. This is crucial, as an "agency remains free in any particular case to diverge from whatever outcome the . . . interpretive rule might suggest." *Viet. Veterans of Am. v. Sec. of the Navy*, 843 F.2d 528, 537 (D.C. Cir. 1988); *see also Alaska v. U.S. Dep't of Transp.*, 868 F.2d 441, 445 (D.C. Cir. 1989) (explaining that an interpretative rule "genuinely leaves the agency . . . free to exercise discretion" (internal quotation marks omitted)). The PTO's bulletin was an interpretative rule because it was "not binding" and instead

Indeed, the majority's description of the Program reveals its legislative character. As the majority explains, the Program's interpretation of "competency" demands of unenrolled preparers a "set number of hours of instruction" and "a minimum score on a test." Maj. Op. at 19. Both aspects feature a numerical cutoff. According to the Program, an unenrolled preparer who completes 17.5 hours of continuing education and scores a 69% on the IRS's test is too "incompetent" to represent taxpayers before the IRS. *See* Rev. Proc. 14-42, § 4.05(3)(a); Annual Filing Season Annual Tax Refresher (AFTR) Course, https://www.irs.gov/pub/irs-utl/aftr_test_parameters.pdf (setting the passing score at 70%). But a preparer who completes 18 hours of continuing education and scores a 71% on the test *is* "competent" (assuming he can meet the Program's other requirements).

We have previously recognized that an agency "performs a legislative function when it makes 'reasonable but arbitrary . . . rules that are consistent with the statute or regulation . . . but not derived from it, because they represent an arbitrary choice among methods of implementation. A rule that turns on a number is likely to be arbitrary in this sense.'" *Catholic Health Initiatives*, 617 F.3d at 495 (quoting *Hoctor v. USDA*, 82 F.3d 165, 171 (7th Cir. 1996)). The Program reduces an unenrolled preparer's "competency" to a set of numbers, none of which is derivable from the text, structure, or history of

left "agency decisionmakers with some discretion" to decide who could sit for the examination. *Tax Analysts v. IRS*, 117 F.3d 607, 617 n.9 (D.C. Cir. 1997). The Program, by contrast, rigidly restricts practice before the IRS *only* to those that meet a specific set of requirements, and these restrictions bind the IRS until the Program is vacated or displaced. *Premysler* cannot rescue the Program from notice and comment.

§ 330(a) or the field of taxpayer representation. *See id.* (suggesting that in "technical areas, where quantitative criteria are common, a rule that translates a general norm into a number may be justifiable as interpretation" (quoting *Hoctor*, 82 F.3d at 171)).[4] The numerical cutoffs look arbitrary, and thus legislative, because it is "impossible to give a reasoned distinction between numbers just a hair on the OK side of the line and ones just a hair on the not-OK side." *Id.* at 496 (quoting *Mo. Pub. Serv. Comm'n v. FERC*, 215 F.3d 1, 4 (D.C. Cir. 2000)).

The majority also dismisses the relevance of the permissive language in § 330(a), which states that the Treasury Secretary "may" require representatives before the IRS to demonstrate "competency" and other attributes. *See* Maj. Op. at 19. The majority is surely correct to reject the notion that "an agency *must* use notice-and-comment rule making whenever the operative statute permits ('may regulate')–but does not require—it to regulate." *Id.* (emphasis added). But that doesn't license us to entirely overlook the statute's permissive language.

A statute that "actually establishes a duty or right is likely to be relatively specific (and the agency's refinement will be interpretive), whereas an agency's authority to create rights and

---

[4] I concede that "[e]ven in a nontechnical area the use of a number as a rule of thumb to guide the application of a general norm will often be legitimately interpretive." *Hoctor*, 82 F.3d at 171. But the Program is not merely a "rule of thumb." It creates a set of flat, "unbending" rules determining who may practice before the IRS. *Id.* If failure to satisfy the Program's education and testing requirements created only a presumption of incompetency, "subject to rebuttal," *id.*, perhaps the rule would be interpretive. But that is not what we face today.

duties will typically be relatively broad (and the agency's actual establishment of rights and duties will be legislative)." *Am. Mining Congress*, 995 F.2d at 1110. In other words, when a rule is "based on specific statutory provisions," it is likely to be interpretative. *Id.* (quoting *United Techs. Corp. v. EPA*, 821 F.2d 714, 719 (D.C. Cir. 1987)). But when a rule is instead "based on an agency's power to exercise its judgment as to how best to implement a general statutory mandate," it is likely to be legislative. *Id.* (quoting *United Techs. Corp.*, 821 F.2d at 720).

Section 330(a) does not itself create any rights or duties for taxpayers or preparers. It merely grants the Secretary power to create duties applicable to preparers who represent taxpayers before the IRS. And it does so by giving the Secretary "relatively broad" discretionary authority to "implement a general statutory mandate." The permissiveness of § 330(a), combined with its generally worded criteria, is yet another clue that the Program does not merely interpret § 330(a).

In short, there is no way an interpretation of "competency" "can produce the sort of detailed . . . . and rigid" requirements the IRS has set forth in the Program. *Catholic Health Initiatives*, 617 F.3d at 496. I'll concede that the Program may be an "extension" of § 330(a)'s "competency" provision and probably "consistent" with that provision. *Id.* But neither of these concessions "leads to the conclusion that the [Program's] limitations represent an interpretation" of § 330(a). *Id.* The connection between the Program and § 330(a)'s competency provision is "simply too attenuated to represent an interpretation of th[at] term[] as used in the statute." *Id.*

19

* * *

I recognize that the line separating "legislative rules" from "interpretative rules" is often difficult to draw. *See Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1046 (D.C. Cir. 1987) (calling the line "fuzzy"). But however challenging it may be, the integrity of agency rule making depends on the judiciary's diligent enforcement of that line. *Cf. Bank Markazi v. Peterson*, 136 S. Ct. 1310, 1336 (2016) (Roberts, C.J., dissenting). When we fail to police that boundary, we allow exceptions to swallow the APA's presumption favoring public participation in rule making. *See U.S. Telecom Ass'n v. FCC*, 400 F.3d 29, 35 (D.C. Cir. 2005) ("[F]idelity to the rulemaking requirements of the APA bars courts from permitting agencies to avoid those requirements by calling a substantive regulatory change an interpretative rule.").

The APA required public notice and comment before the IRS issued the Program. Because the IRS did not provide that opportunity, the Program is unlawful. We should therefore reverse the judgment of the district court and remand for the court to enter an order vacating the Program. *See Daimler Trucks N. Am. LLC v. EPA*, 737 F.3d 95, 103 (D.C. Cir. 2013) ("[T]he court typically vacates rules when an agency 'entirely fail[s]' to provide notice and comment . . . ." (first alteration in original) (quoting *Shell Oil Co. v. EPA*, 950 F.2d 741, 752 (D.C. Cir. 1991))).

Because I believe the majority's approach fails to protect one of the APA's key procedural safeguards, I respectfully dissent.